EUGENE CURNANE *vs.* JOSEPH SCHEIDEL.

First Judicial District, Hartford, October Term, 1897. ANDREWS, C. J.,
TORRANCE, BALDWIN, HAMERSLEY and HALL, JS.

In an action of replevin tried upon the general issue, the plaintiff sought
to recover the possession of a horse which he claimed belonged to
him and had been traded off without his permission by his father-
in-law, S, to the defendant. *Held* that evidence that S had, upon
the plaintiff's suggestion, procured a writ and complaint against the
defendant for fraud in making the trade, in which S was described
as plaintiff and owner of the horse, and which had been read to the
defendant by the officer, was admissible, either for the purpose of
discrediting the plaintiff's claim of title, or, in connection with
other evidence, to show a ratification by the plaintiff of the trade
made by S with the defendant.

The trial court ruled that upon the facts found the plaintiff ratified or
affirmed the acts of S in trading horses. *Held* that this ruling was
fully justified by the facts disclosed upon the record.

[Argued October 6th—decided November 30th, 1897.]

ACTION of replevin to recover the possession of a horse,
brought to the Court of Common Pleas in Hartford County
and tried to the court, *Peck, Associate Judge;* facts found
and judgment rendered for the defendant, and appeal by the
plaintiff for alleged errors in the rulings of the court. *No
error.*

The material facts are as follows: The plaintiff, who was
the owner of the bay horse described in the complaint, had
for several years permitted his father-in-law, Jeremiah Sulli-
van, who resided in Burlington in this State, to keep and use
it on his farm with his own horses. The plaintiff during this
time made his home with said Sullivan, though he only oc-
casionally visited Burlington, passing most of his time in
Boston where he was in business. In the early part of Feb-
ruary, 1897, Sullivan exchanged the horse in question with
the defendant for a black horse and $35. Defendant did
not know that Sullivan was not the owner of the horse he so
traded. Plaintiff's horse was worth from $100 to $150, and

the black horse about $50. On returning home the following evening, and having learned from Sullivan of the trade, and he and Sullivan having discovered that the horse received from the defendant was blind, the plaintiff was dissatisfied, and told Sullivan he must "fix it up" with the defendant. A few days later plaintiff went to defendant's home to ascertain if he still had the bay horse, and talked with the defendant about the horse, saying it was a good horse; but did not tell defendant that he, the plaintiff, owned it, nor in any manner disavow the trade.

Sullivan afterward went to the defendant and complained that he had "stuck him," and asked him to trade back, which the defendant refused to do; and on the 19th of February, at the plaintiff's suggestion, Sullivan caused a writ and complaint to be drawn against the defendant and placed in the hands of an officer for service, in which Sullivan was described as the plaintiff and as the owner of the bay horse, and which alleged that he had been induced to trade by fraudulent representations, and demanded $200 damages.

The plaintiff Curnane was present at a conversation with the officer about serving the writ, and accompanied the officer part way to defendant's house. The officer did not serve the writ, but told defendant its nature and advised him to settle the matter; and the plaintiff, Curnane, was present at a conversation at Sullivan's house where the officer and the defendant had gone, and in which conversation defendant offered to trade back the horse for $10, but Curnane said nothing about owning the horse.

The plaintiff and Sullivan afterwards together demanded of the defendant the $35 to be paid by defendant, and on defendant's claiming that it was not to be paid until March 15th, Curnane urged defendant to pay the money at once, saying: "Give him the $35 and it will be all right;" and that Sullivan wanted the money to buy another horse.

On the 26th of February the plaintiff commenced the present action, and at the time of service of the writ brought back to the defendant the black horse, which defendant refused to receive. Previous to the service of the replevin writ plain-

tiff made no demand upon defendant for the horse, nor had either he or Sullivan informed the defendant, nor had the defendant any knowledge, that the plaintiff owned the horse. On March 15th the defendant tendered to Sullivan the $35, which the latter refused to receive, saying that defendant owed him nothing.

During the trial the defendant offered deputy sheriff Morse as a witness, and asked : " Did you have a writ in your possession in which Sullivan was plaintiff and Scheidel was defendant, with which you went to Scheidel's house, and which you read to him ? "   To this question the plaintiff objected, on the ground that it was immaterial and irrelevant.   Prior to this both Curnane and Sullivan had testified that Curnane owned the horse (which was a controverted question in the case), and also that Sullivan procured the writ in question, and that Curnane knew of the existence and intended service of the writ.   The court admitted the question as tending to contradict Sullivan's testimony that the horse belonged to Curnane, and also as tending, in connection with the other evidence, to show a ratification by Curnane of Sullivan's act in trading the horse.   To the admission of this question the plaintiff excepted.   The answer was : " I did.   I read it in part, and told him what the rest was."   Morse produced the writ, and the defendant offered it in evidence.   The same objection and ruling were made, and the plaintiff excepted to the admission of the writ.   This was the writ procured by Sullivan at the suggestion of the plaintiff, before referred to.

Upon the above facts the plaintiff claimed that the title and right of possession was in the plaintiff, and that he was entitled to judgment in his favor; but the court held that the acts of the plaintiff and his failure to disavow Sullivan's trade of the horse, or to assert his title, constituted a ratification by him of Sullivan's act in trading the horse, and rendered judgment for the defendant.

*Roger S. Newell,* for the appellant (plaintiff).

Upon the facts found the trial court erred in holding that the plaintiff had ratified the act of Sullivan in disposing of

the horse; and also erred in admitting in evidence the writ in which Sullivan was described as plaintiff. *Ellison* v. *Jackson Water Co.*, 12 Cal. 542; *Dunn* v. *Hartford & W. H. R. Co.*, 43 Conn. 434; *Hammerslough* v. *Cheatham*, 84 Mo. 13; *Hamlin* v. *Sears*, 82 N. Y. 327; *Workman* v. *Wright*, 33 Ohio St. 405; *Shominger* v. *Peabody*, 57 Conn. 46; *Whittemore* v. *Hamilton*, 51 id. 153.

*George E. Taft*, for the appellee (defendant).

" When the principal is informed of what has been done, he must dissent, and give notice of it in a reasonable time; and if he does not, his assent and ratification will be presumed." 2 Kent's Comm. 616. On three occasions subsequent to the trade, and prior to the bringing of this action, the plaintiff was present when the matter of the trade was discussed by Sullivan and the defendant. On none of these occasions did he disavow the trade or assert his ownership to the horse in question, which silence on his part, when so apt an opportunity was given him to speak, and when it was his duty to speak, was a confirmation of the trade. *Heath* v. *Taylor*, 10 N. H. 538; *Johnson* v. *Jones*, 4 Barb. 369. The evidence of deputy sheriff Morse was properly received. *Searing* v. *Butler*, 69 Ill. 575; *Cairncross* v. *Lorimer*, 7 Jur. N. S. 149; *Trusdale* v. *Ward*, 24 Mich. 117; *Hayne* v. *O'Hagen*, 60 id. 150.

HALL, J. Under the answer of a general denial the plaintiff was required to prove his title to the horse described in the complaint, or his right of immediate possession. General Statutes, § 1330; *McNamara* v. *Lyon*, 69 Conn. 447.

To establish such ownership both he and Sullivan testified that the horse belonged to the plaintiff. For the purpose of discrediting these witnesses, as well as to show a ratification by the plaintiff of the sale made by Sullivan, the evidence offered by the defendant, that with the knowledge and at the suggestion of the plaintiff Sullivan had procured the complaint for fraud to be drawn in which he was himself described as plaintiff and as the owner of the horse, and that the officer

had read it to the defendant, was properly received. This evidence strongly indicated, either that the testimony of the plaintiff and Sullivan that the former was the owner of the horse, was not true, or that the plaintiff had adopted the contract of exchange made by Sullivan.

The facts found by the court were sufficient to constitute a ratification by the plaintiff of the sale made by Sullivan. The following definition of ratification given by ANDREWS, C. J., in delivering the opinion of this court in the case of *Ansonia* v. *Cooper*, 64 Conn. 536, 544, is especially applicable to the case before us: "Ratification means the adoption by a person, as binding upon himself, of an act done in such relations that he may claim it as done for his benefit, although done under such circumstances as would not bind him except for his subsequent assent; as where an act was done by a stranger having at the time no authority to act as his agent, or by an agent not having adequate authority. The acceptance of the results of the act with an intent to ratify, and with full knowledge of all the material circumstances, is a ratification."

The plaintiff learned from Sullivan himself all the circumstances of the exchange the day after it was made. He was dissatisfied with the results of Sullivan's bargain, but he expressed, even to him, no disapproval of his assumption of authority to make it. Until the commencement of this action the plaintiff had not only failed by any act or word to disapprove Sullivan's authority or to repudiate his contract, but he had both by language and conduct expressed his acquiescence in Sullivan's action and his intention to adopt the trade which Sullivan had made. When he learned that the horse which Sullivan had received was blind, he directed him to "fix it up" with the defendant. In conversation with the defendant about the horse Sullivan had sold him, he neither disaffirmed the trade, nor denied Sullivan's ownership, but told the defendant it would be all right if he would pay Sullivan the "boot" money. He permitted, if he did not authorize, the institution of the action for damages against the defendant, in which Sullivan was plaintiff and in which he was alleged to be the owner of the horse sold to the defend-

ant. The commencement of this action at the direction of the plaintiff, or with his approval, based upon Sullivan's authority to make the exchange, was a positive affirmance of Sullivan's contract. *Shoninger* v. *Peabody*, 57 Conn. 42.

There is no finding that Sullivan intended to defraud the plaintiff, nor that he did not suppose he was authorized to make the exchange.

We think the relations of Sullivan and the plaintiff, as shown by the facts found, were such as permitted the plaintiff to adopt his act.

There is no error.

In this opinion the other judges concurred.